Garth BATES, Appellant,

v.

The STATE of Texas, Appellee.

No. 58338.

Court of Criminal Appeals of Texas, En Banc.

Jan. 10, 1979.

Rehearing Denied Sept. 19, 1979.

Second Motion for Rehearing Denied Oct. 17, 1979.

Marvin O. Teague, Houston, for appellant.

Carol S. Vance, Dist. Atty., Michael Kuhn, William W. Burge and John B. Holmes, Jr., Asst. Dist. Attys., Houston, for the State.

Robert Huttash, State's Atty., Austin, on rehearing, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for the offense of bribery; punishment, which was assessed by the court, is imprisonment for eight years.

Appellant contends that: (1) the statute under which he was prosecuted is unconstitutional; (2) the indictment is defective; (3) the evidence is insufficient to sustain the verdict; (4) certain items which were admitted in evidence were the result of an unlawful search and seizure; (5) certain tape recordings were erroneously admitted in evidence because the proper predicate was not established; (6) the court erred in overruling appellant's motion to examine the original tape recordings; (7) certain acts and statements of a co-party to the offense were erroneously admitted; (8) the court erred in allowing three of the State's witnesses to testify; (9) evidence proffered by appellant to rebut testimony of the State's chief witness was erroneously ex-

cluded; (10) the court erroneously failed to charge the jury on the law of circumstantial evidence, and erroneously refused thirteen other special instructions which were requested by appellant; and (11) the prosecutor engaged in improper argument.

It was established that appellant was elected judge of the 174th Judicial District of this state on November 7, 1972. Appellant took the oath of office on December 28, 1972, and was commissioned on January 5, 1973. He was removed from office on January 11, 1977. See *In re Bates*, 555 S.W.2d 420 (Tex.1977).

Nukie "Frenchy" Fontenot was the principal witness for the State. He testified that he was indicted on September 21, 1975, in the 174th District Court for the offenses of robbery and concealing stolen goods, both of which arose out of an incident which we shall refer to as the Mize robbery. In the latter part of December, 1975, Fontenot was introduced to Ed Riklin, who said "he had been talking to somebody higher up" and indicated that he could help Fontenot secure a probated sentence in exchange for $30,000. In subsequent conversations with Fontenot, Riklin stated that he was a "real close friend" of appellant, with whom he had had previous "dealings." Riklin never specifically mentioned to whom the money was to be paid, referring only to the "big man" and somebody "higher up." Fontenot testified that he understood from his conversations with Riklin that the money was to be paid to appellant. Before paying the money to Riklin, Fontenot wanted assurances that he would receive probation, but Riklin stated that the judge would not meet or talk with Fontenot, and that Fontenot would just have to trust Riklin.

In March, 1976, Fontenot was arrested for aggravated assault, an offense not connected to the pending robbery charge. When Fontenot was released from jail on March 4, he had a conversation with Houston police detectives Sam Nuchia and Earl Musick. Later that same evening, Fontenot and his attorney met with several law

enforcement officers and representatives of the special crimes division of the district attorney's office. At this meeting, Fontenot agreed to work with the police and record any future conversations he might have with anyone concerning his payment of money in exchange for a lighter sentence. During the next few months, from March through July 16, Fontenot recorded numerous conversations with Riklin. In these taped conversations, Riklin never specifically stated that the money was to be paid to appellant in exchange for a probated sentence. However, on numerous occasions Riklin would refer to someone else as "the party," "my friend and your friend," and "the big boy," which Fontenot indicated was the appellant. On two of the tape recordings, appellant's voice is cognizable, indicating his presence in Riklin's apartment.

After these conversations, it finally was agreed that Fontenot would give the money for the probation, the price of which had been raised to $60,000, to Riklin on July 16, 1976. It was arranged that Riklin would meet Fontenot at the Northwest National Bank at 9:00 a. m. at which time Fontenot would give Riklin the $60,000. At 8:20 a. m., July 16, Fontenot met Bob Bennett of the district attorney's office and they placed $59,000 in $100 bills in Fontenot's safe deposit box at the bank.[1] Fontenot met Riklin at 9:00 a. m. and handed the money to him. Appellant was near the bank at the time and was situated so that he could observe the exchange. Immediately after the exchange at the bank, the appellant and Riklin met at the office of James H. Brown, appellant's accountant. At that meeting, Riklin handed Brown two packets of money amounting to $10,000 and stated, "This is the down payment on the apartment at the Beaconsfield." Brown testified that the Beaconsfield apartments were a leasehold property the appellant had been interested in purchasing. The $10,000 from Riklin was a down payment on an apartment Riklin intended to buy once ap-

---

1. While the amount was intended to be $60,-000, it later was established that $1,000 was

left in a Xerox machine by law enforcement officers when the money was photocopied.

pellant had acquired the property. Brown was instructed by appellant to take the $10,000 and get a cashier's check to be used as earnest money in the purchase of the property. After appellant and Riklin left, Brown acquired the cashier's check and delivered it to the escrow holder.

After he left the bank, Fontenot went to the district attorney's office, where he learned that he had delivered only $59,000 instead of the intended $60,000. Upon learning of this shortage, Fontenot telephoned the appellant and Riklin.

After the exchange at the Northwest National Bank, law enforcement officers lost contact with appellant and Riklin, following which they established surveillance at the appellant's house and at Riklin's apartment. Appellant arrived at his home at approximately 10:30 a. m. and was under surveillance until approximately 1:30 p. m., at which time the officers again lost contact with him. Riklin arrived at his apartment at approximately 2:15 p. m., and as he entered his apartment law enforcement officers saw him carrying a shotgun they believed to be of illegal length. The officers tried to obtain a search warrant for the prohibited weapon, but before they could do so Riklin emerged from the apartment with the shotgun at 2:40 p. m. At that time, Riklin was placed under arrest. Riklin subsequently consented to the search of his apartment and $30,000 of the original $59,-000 was recovered. After Riklin's arrest, appellant arrived at the scene and also was placed under arrest. The officers recovered $2,900 of the original $59,000 from appellant's coat pocket.

The State introduced other evidence which tended to show the appellant had a close relationship with Riklin. Testimony also was introduced which tended to show the appellant had certain financial difficulties with the purchase of two ranch properties in 1976 and certain banking transactions in 1975. The defense sought to rebut this testimony and introduced evidence to show the appellant was not in any financial difficulty and could amply afford to purchase both the ranch properties and the Beaconsfield apartments.

Appellant testified in his own behalf that while he was a friend of Riklin, Riklin never indicated that Fontenot was paying money on an understanding that he would give Fontenot a probated sentence. Appellant explained that Riklin had approached the appellant and stated that Fontenot was his friend and he wanted to get an attorney appointed to represent Fontenot. Appellant outlined to Riklin the requisites for appointing an attorney to represent an indigent defendant and said he would help Fontenot by seeing that an attorney was appointed. Appellant did not know Riklin was receiving money from Fontenot or that Riklin was leading Fontenot to believe that appellant would receive the money in exchange for a probated sentence. Concerning the actual exchange, appellant testified that he was told by Riklin that Riklin was going to receive some money from a friend on an old debt. Riklin asked appellant to accompany him in order to take care of the money and so he could give appellant the down payment on Riklin's apartment. When Riklin gave the $10,000 to Brown, it never was indicated that the money belonged to appellant, nor was there any discussion concerning Fontenot.

In regard to the money found in his possession, the appellant stated that Rinklin had given him $4,000, which was intended to be $5,000, that Riklin owed appellant for an automobile appellant had sold Riklin and for a small gambling debt. After depositing $1,100 in a bank account, appellant had the $2,900 found by the officers at the time of his arrest.

In rebuttal, the State introduced the testimony of Irwin Howard, who testified that he had been under indictment for theft by false pretense in appellant's court. After Howard had been contacted by Riklin, he had spoken to appellant and stated, "Mr. Riklin has told me for somewhere in the neighborhood of $10,000 that this case that's pending against me in your courtroom can be taken care of," to which the appellant replied, "Myself and Mr. Riklin are looking into the matter and Mr. Riklin

will be handling it with you from this point on. Don't worry about it."

On defense rebuttal, appellant denied he spoke to Howard, and Howard's attorney testified that Howard never mentioned talking to appellant. Further, it was established that Howard had been offered probation in a plea bargaining agreement worked out between Howard's attorney and the State.

■ Appellant's second ground of error complains of the trial court's refusal to rule V.T.C.A. Penal Code, Sections 36.02 and 36.08 unconstitutional on account of their alleged violation of federal and state constitutional provisions.

With respect to appellant's contention regarding Section 36.08, we conclude that appellant has no standing to challenge such statute since he was clearly being prosecuted pursuant to the felony provisions of Section 36.02. See *U. S. v. Irwin,* 354 F.2d 192 (2nd Cir. 1965).

■ Appellant contends that Section 36.02 is void for vagueness, indefiniteness, and overbroadness. A statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1953), and if it encourages arbitrary and erratic arrests and convictions. *Papachristou v. City of Jacksonville,* supra; *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed.

1093 (1940); *Herndon v. Lowrey,* 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937). V.T.C.A. Penal Code, Section 36.02, provides as follows:

"(a) A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:

(1) any pecuniary benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter;

(2) any benefit as consideration for the recipient's decision, vote, recommendation, or other exercise of official discretion in a judicial or administrative proceeding; or

(3) any benefit as consideration for a violation of a duty imposed by law on a public servant or party official.

(b) It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office or he lacked jurisdiction or for any other reason.

(c) An offense under this section is a felony of the second degree. Amended by Acts 1975, 64th Leg., p. 915, ch. 342, sec. 11, eff. Sept. 1, 1975."

This same offense, as set forth in our former penal code, was similarly attacked as being void for vagueness in *Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr.App.1974).[2]

2. Article 159, V.A.P.C., provided as follows:
"Officers accepting bribe
Any legislative, executive or judicial officer, or any employee or agent, or person holding a position of honor, trust or profit with, or any person acting for or on behalf of, the State of Texas, any board, commission, agency or department thereof, any county, school district, city or town, or any political subdivision or municipal corporation whatsoever, who shall accept a bribe, or agree or consent to accept a bribe under an agreement or with an understanding that his act, vote, recommendation, opinion or judgment shall be done, influenced or given in any particular manner or upon a particular side of any ques-

tion, matter, contract, cause of proceeding which is or may thereafter be pending, or which may be brought or come before him in his official capacity, or in his place, agency or position of employment, or in his position of honor, trust or profit, or that he shall make any particular nomination or appointment, or shall do any other act, or omit to do any act, in violation of his duty as a officer, or his position, agency or employment shall be guilty of bribery and shall be punished as is provided in Section 1 of this Act; or any such person who shall ask, solicit or offer to accept a bribe with the intent or for the purpose of influencing his act, decision, vote, opinion or recommendation, on any question, matter, nomination, cause, proceeding or

This Court concluded in *Mutscher* that the relevant bribery statutes of the then applicable penal code "clearly furnish[ed] adequate warning to anyone of ordinary intelligence that the kind of conduct embarked on by appellants would constitute an offense." The present penal code section making bribery an offense is an amendment of the 1974 codification of the various provisions previously set forth in Title V, Chapter 1, of our former penal code. It is readily apparent, from a review of the current statute, what conduct is prohibited by the statute and that the statute's application is appropriately restricted so as not to result in arbitrary and erratic convictions. We therefore hold that V.T.C.A. Penal Code, Section 36.02 is not unconstitutionally vague or indefinite. See *Connally v. General Construction Company,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1925); *McMorris v. State,* 516 S.W.2d 927 (Tex.Cr.App.1974).

 As noted in *McMorris,* supra, "a clear and precise statute may nevertheless be overbroad if in its reach it prohibits constitutionally protected conduct." See *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). It is noted that appellant has not pointed to any constitutionally protected activity that may be restricted by the reach of Section 36.02. Such an omission on appellant's part is understandable since "[T]he inequity of the procuring of public officials, be it intentional or unintentional, is so fatally destructive to good government that a statute designed to remove the temptation for a public official to give preferment to one member of the public over another, by prohibiting all gifts 'for or because of an official act,' is a reasonable and proper means of insuring the integrity, fairness and impartiality of the administration of the law." *U. S. v. Irwin,* supra, at 196. Although *Irwin* dealt with the federal bribery statute, Title 18, U.S.C., Section 201(f), its reasoning is equally applicable to the conduct sought to be restricted by Section 36.02. We hold that Section 36.02 is not overbroad in violation of any constitutional provisions. See *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972); *McMorris v. State,* supra.

Appellant further attacks the constitutionality of Section 36.02 on the ground that the caption of said statute fails to comply with the constitutional mandate of Article III, Section 35, of the Texas Constitution. He contends that the caption to the Acts of the 64th Legislature which amended Section 36.02 failed to put the public or legislature on notice of the changes enacted by the amendment in said statute.

 Article III, Section 35, Texas Constitution, provides, in pertinent part, as follows:

"But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed."

It is clear that this provision of the Texas Constitution is entitled to liberal construction, *Castellano v. State,* 458 S.W.2d 73 (Tex.Cr.App.1970), but a stricter standard is enforced when the matter addressed is an amendatory act. *White v. State,* 440 S.W.2d 660 (Tex.Cr.App.1969). The critical question for determining adequate compliance with Article III, Section 35, of the Texas Constitution is whether the caption "put any reasonable caption reader on no-

contract which may at any time be pending, or which may be brought or come before him in his official capacity, or in his employment, agency or place or position of honor, trust or profit shall be guilty of bribery and shall be confined in the penitentiary not less than two nor more than ten years, or be confined in jail for not less than one month nor more than two years, or be fined not less than Five Hundred Dollars nor more than Five Thousand Dollars, or by both such fine and imprisonment."

Article 177, V.A.P.C., provided:
"Bribe

By a 'bribe' as used throughout this Code, is meant any gift, emolument, money or thing of value, testimonial, privilege, appointment or personal advantage, or the promise of either, bestowed or promised for the purpose of influencing an officer or other person, such as are named in this chapter, in the performance of any duty, public or official, or as an inducement to favor the one offering the same, or some other person."

tice that he will find new matter in the body of the bill." *Ex parte Jimenez,* 159 Tex. 183, 317 S.W.2d 189 (1958). The caption to the act amending Section 36.02, inter alia, reads as follows:

> "An Act amending various parts of the Penal Code as follows: . . . ; amending Section 36.02 relating to bribery and penalty therefor; . . . ." Acts 1975, 64th Leg., ch. 342, p. 912.

The changes effected in Section 36.02 by the Acts of the 64th Legislature now complained of by appellant reflect that: (1) the actors to which the offense applies and the requisite culpable mental state were consolidated under Subsection (a); (2) the proscribed purposes for which the unlawful activity was engaged in were consolidated in Subsections (1), (2), and (3) of Subsection (a); (3) the proscribed purpose for the unlawful activity was changed from a "specific exercise of official powers" to a more general proscription; and (4) all offenses proscribed by this section were made subject to a uniform, second degree felony penalty.

The caption set forth above cannot be construed as in any way obscuring the purpose of the amendment from legislators or citizens and is, contrary to appellant's position, sufficient to give the notice required under Article III, Section 35, of the Texas Constitution. Unlike *White v. State,* supra, there is not a veiled reference to the changes enacted by the amendatory act. Any caption reader would be apprised of the fact that the bribery statute was being amended in terms of substance and penalties. We therefore hold that the caption relating to the amendments of V.T.C.A. Penal Code, Section 36.02 does not violate the provisions of Article III, Section 35, Texas Constitution.

■ Appellant contends that the court erred in overruling his motion to quash the indictment because it is so vague and indefinite that it did not apprise him of the offense with which he was charged. We do not agree. The indictment alleges, in pertinent part, as follows:

". . . GARTH BATES hereinafter referred to as the Defendant, heretofore on or about July 16, 1976, did then and there unlawfully, acting as a party with Ed Riklin, intentionally and knowingly solicit, accept, and agree to accept from Nukie Fontenot a pecuniary benefit, namely, money, with the representation and understanding that the Defendant, a Texas District Judge presiding in the 174th District Court of Harris County, Texas, would be influenced in the specific exercise of his official decisions, powers, duties and discretion as a District Judge, namely that the Defendant would not sentence Nukie Fontenot to the Texas Department of Corrections in the felony case then pending against Nukie Fontenot in the 174th District Court of Harris County, Texas, and that the Defendant would help Nukie Fontenot in the felony case then pending against Nukie Fontenot in the 174th District Court of Harris County, Texas, and that the Defendant would be lenient in sentencing Nukie Fontenot in the felony case the pending against Nukie Fontenot in the 174th District Court of Harris County, Texas . . ."

The indictment employs substantially the language of V.T.C.A. Penal Code, Section 36.02. It does not allege more than one offense, but rather alleges several means of committing the offense of bribery. The court did not err in overruling appellant's motion to quash the indictment.

■ Appellant asserts that the evidence is insufficient to sustain the conviction because the testimony of the accomplice witness Fontenot was not corroborated as required by Article 38.14, V.A.C.C.P.

> "The test of sufficiency of corroboration of the testimony of an accomplice witness is to eliminate the evidence of the accomplice from consideration and then examine evidence of other witnesses to ascertain if there be inculpatory evidence or evidence of incriminating character. which tends to connect the accused with the commission of the offense."

*Cherb v. State,* 472 S.W.2d 273 (Tex.Cr.App. 1971). The evidence in the instant case which corroborates the testimony of the accomplice witness Fontenot includes the following:

(1) the tape recordings which were introduced into evidence showed that appellant had spoken to Fontenot and that appellant's voice was discernible during conversations between Riklin and Fontenot;

(2) appellant and Riklin knew each other well;

(3) appellant was present and observed the exchange of money between Fontenot and Riklin;

(4) appellant was in possession of a portion of the money when he was arrested; and

(5) appellant's accountant used a portion of the money to purchase a cashier's check for use in real estate transaction in which appellant was involved.

This evidence is amply sufficient to corroborate the testimony of Fontenot and to sustain the conviction.

■ Appellant also complains that certain items, including portions of the money paid by Fontenot to Riklin, which were admitted in evidence were taken from him, his car, Riklin and Riklin's apartment by unlawful searches and seizures. Since appellant had no legitimate expectation of privacy or interest of any kind in either Riklin's person or his apartment, and since the case against appellant did not depend on possession of the seized evidence at the time of the contested search and seizure, he lacks standing to challenge the admission of the evidence taken from Riklin. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Smith v. State,* 530 S.W.2d 827 (Tex.Cr.App.1975).

■ Detective Musick arrested appellant as he arrived at Riklin's apartment. Musick testified that he recognized appellant as he drove up to the apartment and that he ran to appellant's vehicle while displaying his badge and asked appellant to stop. When Musick asked appellant to step from the car, appellant reached into the pockets of his coat. Musick then told appellant to remove his hand from the coat, and appellant doffed the coat and laid it on the seat of the car, saying, "I don't have anything in my coat." After appellant stepped from the car he asked why he was being stopped. He then asked Musick to get his car keys, which he said were in his coat, for him. When Musick looked inside the coat, he saw twenty-nine one hundred dollar bills.

Appellant argues that his arrest—and therefore the search of his coat which resulted in the seizure of the $2,900—was unlawful because Musick lacked probable cause to arrest appellant. When appellant was arrested, Musick was aware that incriminating tape recordings had been made of conversations between Fontenot and Riklin and between Fontenot and appellant. Musick observed the transfer of money between Fontenot and Riklin and observed that appellant "was very close to the vicinity." After Riklin received the money from Fontenot, he and appellant departed in different cars at approximately the same time. Appellant was arrested as he drove up to Riklin's apartment several hours after the exchange of money.

■ Article 14.01, V.A.C.C.P., provides, in pertinent part, as follows:

"(b) A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view."

We hold that probable cause existed for appellant's arrest and that the arrest was authorized by Article 14.01(b), supra. The search of appellant's coat and the seizure of the money therefrom were conducted incident to a lawful arrest and did not exceed the permissible scope for such a search. See *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978); *Tarpley v. State,* 565 S.W.2d 525 (Tex.Cr.App.1978).

■ Appellant urges that the tape recordings were erroneously admitted in evidence because the proper predicate had not

been established. The necessary predicate for the admission of tape recordings is as follows:

"(1) A showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.

\* \* \* \* \* \*

". . . [W]e also find that at least some of the requirements can be inferred from the testimony and need not be shown with the same particularity required for admission of other mechanically acquired evidence, such as the results of a breathalyzer test."

Edwards v. State, 551 S.W.2d 731 (Tex.Cr. App.1977). Without indulging in a detailed recitation of Fontenot's testimony, we merely observe that he established each of the seven elements required by Edwards. We hold that the proper predicate was laid for admission of the tape recordings.

▮ Appellant also argues that the tape recordings were inadmissible because Fontenot did not comply with the provisions of Article 4413(29bb), Sec. 13(a), V.A.T.S. That statute is concerned with the licensing of private investigators and is patently inapplicable to Fontenot, who was taking part in a criminal investigation as an agent of the State.

▮ Appellant contends that the court erred in overruling his motion for inspection of the original tape recordings of the conversations between Fontenot and Riklin and between Fontenot and appellant. · (Appellant was allowed to inspect copies of the recordings). The court should have granted appellant's motion to inspect the original tape recordings. Given the facts of this case, however, the failure to do so does not constitute reversible error.

Appellant relies on Detmering v. State, 481 S.W.2d 863 (Tex.Cr.App.1972), and Terrell v. State, 521 S.W.2d 618 (Tex.Cr.App. 1975). In each of those cases, the defendant sought to inspect the contraband he was charged with possessing; the items of which examination was requested not only constituted important evidence, but were indispensable to the State's case. The recordings in the instant case constituted only one strand in a web of incriminating evidence adduced at trial. (See the discussion, supra, of the incriminating evidence which tended to connect appellant with the commission of the offense with which he was charged.)

The proper predicate for the introduction of the recordings was laid. The record contains no indication that the recordings were in any way altered, and appellant does not so suggest on appeal.

Article 39.14, V.A.C.C.P., under which appellant moved for an examination of the tape recordings, vests the trial court with discretion in considering such motions, as does Art. 39.02, V.A.C.C.P., which provides for the taking of depositions by the defendant. We have held that before an abuse of discretion in refusing to allow the taking of depositions will be found, the defendant must show that he was thereby injured. James v. State, 546 S.W.2d 306 (Tex.Cr. App.1977); Beshears v. State, 461 S.W.2d 122 (Tex.Cr.App.1970). We also have held that the prosecution's failure to comply with a discovery order under Art. 39.14, supra, may constitute harmless error. Hollowell v. State, 571 S.W.2d 179 (Tex.Cr.App. 1978). Appellant has not affirmatively shown how he was injured by the court's refusal to allow inspection of the tape recordings. Consequently, the denial of the motion for inspection constituted harmless error.

Appellant contends in four related grounds of error that certain acts and statements of Riklin were erroneously admitted in evidence because they were hearsay, because their admission violated appellant's constitutional right to confront the witnesses against him, and because they were mere "narrative declarations."

■ Where there is sufficient independent evidence to establish a conspiracy, hearsay acts and statements of a conspirator which are made during the course of and in the furtherance of the conspiracy are admissible against another conspirator. *Denney v. State*, 558 S.W.2d 467 (Tex.Cr. App.1977); *Delgado v. State*, 544 S.W.2d 929 (Tex.Cr.App.1977).

■ The independent evidence of a conspiracy in the instant case is quite ample. It is appellant's contention, however, that the conspiracy terminated when Fontenot paid the money to Riklin, and any subsequent acts and statements by Riklin were therefore inadmissible. See *Delgado v. State*, supra. We do not agree.

> "[A] conspiracy is not terminated until everything has been done that was contemplated to be done by the conspirators."

*Baugh v. State*, 135 Tex.Cr.R. 590, 122 S.W.2d 297 (1938). The conspiracy in the instant case did not terminate upon the completion of the offense of bribery, of which appellant was convicted. It was contemplated by the conspirators that Fontenot would be granted a probated sentence, and until that was done, the conspiracy could not terminate. See *Denney v. State*, supra; *Lamberson v. State*, 504 S.W.2d 894 (Tex.Cr.App.1974). Admission of the acts and statements of Riklin did not violate appellant's right to confront the witnesses against him. See *Morgan v. State*, 519 S.W.2d 449 (Tex.Cr.App.1975).

Since appellant has not directed our attention to which particular statements by Riklin were mere "narrative declarations," nothing is presented for review as to that ground of error. See *Williams v. State*, 549 S.W.2d 183 (Tex.Cr.App.1977); *Smith v. State*, 547 S.W.2d 6 (Tex.Cr.App.1977).

■ Appellant urges that the court erred in allowing Wendell Odom, Jr., Charles O. Ford, and Gus George to testify. Odom, an assistant district attorney, testified that appellant had intervened in Riklin's behalf while Odom was investigating Riklin in a consumer fraud case. Ford, an officer of the Houston Police Department,

testified that appellant had sought to assist Riklin after Ford had arrested Riklin on a narcotics charge. George, a Harris County deputy sheriff, testified that appellant had asked him to hire Riklin as an employee of the Sheriff's Department. Appellant argues that Odom, Ford and George should not have been allowed to testify because their testimony showed extraneous offenses committed by appellant which were irrelevant to the offense for which appellant was being tried. We do not agree. The State was entitled to prove, in order to show the existence of a conspiracy, that a close relationship existed between appellant and Riklin. More important, the testimony of which appellant complains shows only that he tried to assist Riklin on several occasions and did not show that he was guilty of any offense or misconduct. See *Kennedy v. State*, 520 S.W.2d 776 (Tex.Cr.App.1975).

Appellant asserts that the court erred in refusing to allow John Tanner, an undercover officer of the Harris County Sheriff's Department, to testify and rebut certain testimony given by Fontenot. Fontenot testified that he did not have a "deal" with the district attorney's office to have any pending charges dropped in exchange for his testimony. On cross-examination, Fontenot admitted that he sold some jewels to Tanner, but denied involvement in the Mize robbery. Fontenot also denied negotiating to sell guns to Tanner in exchange for narcotics or asking Tanner to kill a man named Pope.

Appellant sought to impeach this evidence with the testimony of Tanner, who testified, on a bill of exception, that he had met Fontenot in his capacity as an undercover officer while trying to purchase machine guns. Originally, Tanner testified, he was to pay for the machine guns with marihuana, but Fontenot later demanded money. While in Fontenot's pawn shop during these negotiations, Fontenot asked Tanner if Tanner "was interested in doing a jewelry robbery on a salesman." Tanner told Fontenot he would be interested only after the machine gun negotiations were completed. Fontenot later specifically identi-

fied Mize as the target of the robbery. After this robbery occurred, the negotiations on the machine guns terminated. Tanner then arranged to purchase some of the jewelry from the Mize robbery. Fontenot stated that he was the "brains of the operation" and had "set up" the Mize robbery. After Fontenot sold some jewelry to Tanner, he was arrested and subsequently indicted for that offense. Tanner testified that during the negotiations as to the purchase of the jewelry Fontenot asked Tanner if he would be interested in killing an individual named Pope. Fontenot agreed to furnish the gun for the killing and stated he had several stolen guns in his pawn shop.

Appellant argues that this evidence was admissible to impeach Fontenot's denials of these facts and to rebut the implication his testimony left with the jury that Fontenot was "a fine Christian man." The court ruled that defense counsel could not introduce evidence of the "machine gun deal," the "dope deal," or of the arrangement made by Fontenot to kill Pope, as they were collateral matters, but the court ruled that the defense could introduce the testimony concerning the Mize robbery. Appellant failed to avail himself of the court's ruling admitting evidence of the Mize robbery by not calling Tanner to testify about it before the jury.

 When a witness is cross-examined on a collateral matter, the cross-examining party cannot then contradict the witness. *Arechiga v. State*, 462 S.W.2d 1 (Tex.Cr.App.1971); *Gatson v. State*, 387 S.W.2d 65 (Tex.Cr.App.1965); *Hatley v. State*, 533 S.W.2d 27 (Tex.Cr.App.1976); *Barrett v. State*, 86 Tex.Cr.R. 101, 215 S.W. 858 (1919). See 2 Wharton's Criminal Evidence, Sec. 467 (13th ed. 1972). The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case tending to establish his plea. *Hoffman v. State*, 514 S.W.2d 248 (Tex.Cr.App.1974); *Arechiga v. State*, supra. See 3A Wigmore, Evidence, Sec. 1003 (Chadbourn rev. 1970); Wharton, Sec. 467, supra.

 Of course, great latitude should be allowed the accused to show a witness' bias or motive to testify falsely against him. See *Castro v. State*, 562 S.W.2d 252 (Tex.Cr.App.1978). However, trial courts have considerable discretion as to how and when bias may be proved and as to what evidence is material for that purpose. See *Cloud v. State*, 567 S.W.2d 801 (Tex.Cr.App.1978); 2 Wharton's Criminal Evidence, Sec. 457 (13th ed. 1972). In the instant case, no charges had been brought against Fontenot for any of the alleged activities—gun and drug transactions and a murder plot—of which evidence was excluded, nor was it shown that those events were in any way connected to the offense for which appellant was being tried. See *Cloud v. State*, supra; *Garza v. State*, 532 S.W.2d 624 (Tex.Cr.App.1976); *Smith v. State*, 516 S.W.2d 415 (Tex.Cr.App.1974). Consequently, the proffered evidence of unrelated misconduct on the part of the witness was not probative of bias or motive to testify falsely, and the trial court properly excluded it.

Appellant makes a number of complaints concerning the court's charge. First, he urges that the court erred in refusing his requested charge on circumstantial evidence.

 Where there is any direct evidence of the main fact to be proved, a charge on circumstantial evidence is not required. *Ridyolph v. State*, 545 S.W.2d 784 (Tex.Cr.App.1977); *Ransonette v. State*, 550 S.W.2d 36 (Tex.Cr.App.1977, Opinion on Appellant's Motion for Rehearing). Such an instruction need not be given where the State relies only in part on circumstantial evidence, *Ransonette v. State*, supra; *Lawler v. State*, 110 Tex.Cr.R. 460, 9 S.W.2d 259 (1927); *Coleman v. State*, 90 Tex.Cr.R. 297, 235 S.W. 898 (1921), even though the State relies on a chain of circumstances which may be considered the major part of the incriminating evidence. *Ransonette v. State*, supra; *Dodd v. State*, 149 Tex.Cr.R. 156, 192 S.W.2d 263 (1946).

 Appellant was indicted and tried as a party to the offense of bribery, and the court charged the jury on the law of crimi-

nal responsibility. See V.T.C.A. Penal Code, Sec. 7.01. Direct evidence of appellant's participation in the offense included Fontenot's testimony concerning conversations with appellant and Riklin and tape recordings of those conversations, appellant's observation of the exchange of money between Fontenot and Riklin, and appellant's possession of a portion of that money. The court did not err in refusing the requested charge on circumstantial evidence.

Of the thirteen other requested instructions which appellant contends the court improperly refused, one concerns the law of parties, two deal with the necessity for corroboration of accomplice witnesses' testimony, and three are addressed to mere presence, association or discussion being insufficient to corroborate the testimony of the accomplice witness. The court charged the jury on the law of parties and the necessity that the testimony of the accomplice witnesses be corroborated. This charge adequately protected appellant's rights, and the court did not err in refusing the requested instructions.

Appellant has not directed our attention to any evidence which would have raised the issues of mere presence, association and discussion. Appellant witnessed the exchange of money between Fontenot and later was found in possession of a portion of the money. See *Dillard v. State*, 550 S.W.2d 45 (Tex.Cr.App.1977). Appellant's requested instructions on these issues were properly refused.

The remaining seven instructions requested by appellant deal with the law of conspiracy. The court instructed the jury as follows regarding the law of conspiracy:

"There have been admitted in evidence statements allegedly made by the witness Nukie Fontenot to Ed Riklin and statements allegedly made by Ed Riklin to Nukie Fontenot, said statements having been made outside the presence of the defendant, Garth Bates. You are instructed that before you may consider such statements, if any, as evidence against the defendant, Garth Bates, you must believe beyond a reasonable doubt that the defendant, Garth Bates, and Ed Riklin had agreed to commit and were acting together in the commission of the offense alleged in the indictment. In this connection you are instructed that you may not find that the defendant, Garth Bates, and Ed Riklin had agreed to commit and were acting together in the commission of the offense alleged in the indictment from consideration of the statements, if any, made outside the presence of the defendant, Garth Bates, by and between Nukie Fontenot and Ed Riklin, alone, but there must be other evidence, in addition to such statements, to warrant a finding that the defendant, Garth Bates, and Ed Riklin had agreed to commit and were acting together in the commission of the offense alleged in the indictment.

"If you do not so believe, or if you have a reasonable doubt thereof, you cannot consider such statements, if any, as evidence against this defendant, Garth Bates."

Appellant argues that he was entitled to his requested instructions on the law of conspiracy because he was tried as a conspirator. This is not the case. Appellant was indicted and tried as a party to the offense of bribery, and the court's charge authorized the jury to convict appellant on this theory alone. The law of conspiracy was relevant only insofar as the admissibility of certain acts and statements was concerned, and the court's charge thereon adequately protected appellant's rights.

Appellant's final contention is that the following argument by the prosecutor, to which no objection was made, constituted fundamental error:

"Believable judge? You know there's a little thing in law that allows a person when they are on trial and they take the stand and credibility is under attack, they can bring in character witnesses to show that they are a person of truth and voracity. Maybe I missed this. I didn't see a one. The Judge who denies his guilt even · on this."

We cannot characterize the argument of which appellant complains as being so prejudicial that it could not have been rendered harmless by the sustaining of an objection thereto and an instruction to the jury to disregard it. See *Baker v. State*, 368 S.W.2d 627 (Tex.Cr.App.1963). Appellant has waived any error by his failure to object. See *Williams v. State*, 463 S.W.2d 436 (Tex.Cr.App.1971).

The judgment is affirmed.

ODOM and CLINTON, JJ., not participating.

PHILLIPS, Judge, dissenting.

## I.

Corrupt public officials are no less citizens deserving of the protection of our laws and procedures than any other person who appeals to this Court. The majority affirms this case notwithstanding two serious errors committed by the trial court in the course of this trial. The first error was failing to allow the defense to have independent experts examine the tape recordings that were indispensable to the State's case. The second such error was failing to allow the defense to develop for the jury the context in which Nukie "Frenchy" Fontenot was brought to them as the State's "principal witness."

## II.

On August 18, 1976, appellant filed a motion for an independent examination, inter alia, of the *original* tape recordings at any laboratory designated by the district attorney. Article 39.14, V.A.C.C.P., provides:

"Upon motion of the defendant showing good cause therefor and upon notice to the other parties, the court in which an action is pending may order the State before or during trial of a criminal action therein pending or on trial to produce and permit the inspection and copying or photographing by or on behalf of the defendant of any designated documents, papers, written statement of the defendant, (except written statements of witnesses and except the work product of counsel in the case and their investigators and their notes or report), books, accounts, letters, photographs, objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action and which are in the possession, custody or control of the State or any of its agencies. The order shall specify the time, place and manner of making the inspection and taking the copies and photographs of any of the aforementioned documents or tangible evidence; provided, however, that the rights herein granted shall not extend to written communications between the State or any of its agents or representatives or employees. Nothing in this Act shall authorize the removal of such evidence from the possession of the State, and any inspection shall be in the presence of a representative of the State."

Appellant's motion was ultimately overruled by the trial court prior to trial.

The appellant relies exclusively on this Court's rulings in *Detmering v. State*, 481 S.W.2d 863 (Tex.Cr.App.), and *Terrell v. State*, 521 S.W.2d 618 (Tex.Cr.App.), appeals in which convictions for possession of LSD and marihuana, respectively, were reversed because the trial courts overruled the appellants' pretrial motions for an independent examination of the drugs allegedly possessed. In both opinions by Judge Morrison, *no* express mention is made of whether and to what extent "good cause" must be alleged or shown in a motion for "inspection" of non-privileged "tangible things . . . which constitute or contain evidence material to any matter involved in the action." As a threshold matter, we hold that the requirement of "good cause" is necessary to a motion for *inspection* as well as one for discovery. *Smith v. State*, 468 S.W.2d 828 (Tex.Cr.App.); *Sonderup v. State*, 418 S.W.2d 807 (Tex.Cr.App.); *Hoffman v. State*, 514 S.W.2d 248 (Tex.Cr.App.); *Feehery v. State*, 480 S.W.2d 649 (Tex.Cr. App.). That this Court's consideration of the "good cause" issue when confronting a request for independent examination of

particular evidence to be relied upon by the State varies from its analysis vis-a-vis more general discovery motions is demonstrated in its opinions in *Detmering* and *Terrell*, supra, and is underscored by Judge Douglas's opinion in *Feehery v. State*, supra, Footnote 2. The primary reason for this variation in analysis is that an "inspection" means "more than a visual examination of an object. [A] visual examination would not always divulge anything of probative value" concerning "the item on which the State bases its case . . . ." [1] *Detmering v. State*, supra, at 864. Additionally, *Detmering* leaves us with the idea that "good cause" will be imputed by this Court if the evidence sought to be examined is "the item on which the State bases its case," i. e., a crucial piece of physical evidence. *Id.* at 864.

Thus, inquiry now turns to whether the tape recordings sought to be examined by appellant were pieces of physical evidence crucial to the State's case or, in other words, "item[s] on which the State base[d] its case" against appellant.

The State's chief incriminating witness was Nukie (Frenchy) Fontenot. The trial court charged the jury that this witness was an accomplice witness as a matter of law, thereby requiring the State to corroborate his testimony before the jury could rely upon it. Article 38.14, V.A.C.C.P. The tape recordings of conversations between Riklin and Fontenot and appellant and Fontenot, made by Fontenot, were crucial in corroborating the accomplice witness testimony of Fontenot. These tape recordings tended to connect appellant to the offense of bribery and make Fontenot's testimony more likely than not trustworthy. *Caraway v. State*, 559 S.W.2d 661 (Tex.Cr.App.); Article 38.14, V.T.S.A., C.C.P., Note 119.

Of additional relevance to the consideration of whether "good cause" existed for appellant's motion for an independent examination of the *original* tape recordings is the fact that accomplice witness Fontenot provided the testimonial predicate for the admission of the tape recordings as required under *Edwards v. State*, 551 S.W.2d 731 (Tex.Cr.App.). One of the seven elements required for a predicate is that no changes, additions, or deletions have been made on or to the tape recordings. In this vein, there appear to be pauses in the recordings, as well as unintelligible statements marked as "(?)" in the record.[2] The pauses were explained by Fontenot to have resulted from

---

1. With respect to the adequacy of an examination of the copies provided defense counsel under their discovery motion, the testimony of Dr. Thomas G. Stockham at the hearing on appellant's motion for new trial is illuminating.

 "Q Now, then, my question of you, sir, in your opinion, is it professionally agreeable to inspect or examine tapes to do so from a copy rather than the original?
 A It will be extremely much more difficult to make any intelligent examination of such tapes from a copy compared to from an original.
 Q Can you explain just briefly why this is so?
 A Yes. First of all, the original tape has information on it concerning the details of how it was made, what kind of machine it was made on, the nature of that machine and so on, which are completely eliminated in the process of creating a copy. Much of the information that is germane to the authenticity and originality of the first tape, the actual tape originally made cannot be physically transcribed by making a copy. Some can, however, the amount of information that is transferred on this copy relative to this issue constitutes a minority of the important information.
 MR. REYNOLDS: I have no further questions.
 CROSS–EXAMINATION
 QUESTIONS BY MR. HOLMES:
 Q Doctor, could you listen to a copy of the original tape and determine from listening to that copy whether or not any reasonable ground exists to subject it to further tests, for example?
 A Not with much reliability.
 Q You would not listen to a copy to make that determination?
 A Well, you might listen to a copy, but you wouldn't place very much weight on that particular kind of examination . . . ."

2. An example is the following statement by Riklin to Fontenot on June 8, 1976, following a recorded call between Bates and Fontenot in which Bates pointed out the impropriety of the ex parte communication and the necessity of disqualifying himself if Fontenot did not terminate the conversation:

 RIKLIN: "It's over with (inaudible) is going to disqualify himself and that's it that—"

the displacement of the suction-cup device used on the phone to record the conversations. Although the ultimate question of whether the tapes are admissible is a matter for the trial court's discretion, an expert witness would be material to the informed exercise of that discretion. Such a witness would also be essential to any defense against the admissibility of the tape recordings.

Finally, in a bribery prosecution, the essence of the offense is the "understanding" upon which the offer or acceptance of money or other benefit is predicated. It must be "as consideration for the recipient's . . exercise of official discretion . . . ." V.T.C.A., Penal Code, Section 36.02. Thus, the discussions or linguistic context of the terms of the offer or acceptance are critical to any successful bribery prosecution. This inescapable fact renders the tape recordings critical to the State's case and renders the trial court's refusal to order an independent examination of the *original* tape recordings reversible error. *Detmering v. State*, supra; *Terrell v. State*, supra.

The majority concedes much of the foregoing when it holds the motion should have been granted. Yet it ignores the same considerations when it concludes the error was harmless because there has been no showing of any tampering or alterations. In holding that the accomplice witness Fontenot was corroborated in his testimony, the tape recordings are cited first. Only his possession of the marked money aids corroboration, but not as to Fontenot's testimony that it was his "understanding" that the payoff to Riklin was in consideration for the appellant's granting probation to Fontenot. For this crucial element of the case, the tapes were indispensable. Additionally, the majority points out that the predicate for the admission of the tape recordings into evidence was established by the accomplice witness Fontenot.

The failure of the trial court to accord the appellant an adequate opportunity to prepare his defense should call for a reversal.

### III.

In his ground of error one, the appellant contends that the trial court erred in failing to allow John Tanner, an undercover officer, to testify and rebut certain testimony given by the State's primary witness Nukie Fontenot. Fontenot testified that he did not have any "deal" with the district attorney to drop any pending charges in exchange for his testimony. On cross-examination, Fontenot denied his involvement in the Mize house robbery and stated he was not guilty of that offense. Fontenot admitted he sold some jewels to undercover officer Tanner but denied telling Tanner he "set up" the robbery. With regard to other criminal actions, Fontenot testified as follows:

"Q [By the appellant's attorney] As a matter of fact you asked Mr. Tanner during this conversation, Mr. Fontenot, you asked him would he kill a man by the name of Pope. Do you remember that?

A No sir, I did not.

Q You did not do that. You don't remember asking Mr. Tanner if he would kill Pope if the price was right?

A No sir, I didn't.

Q Do you remember Mr. Tanner asking you if you were going to furnish the weapon and you said that you would?

A No sir, I did not.

\* \* \* \* \* \*

Q Sometime before you started talking to Mr. Riklin, did you tell Mr. Tanner that you had been working on buying some machine guns?

A Not to Mr. Tanner, no.

\* \* \* \* \* \*

Q Did you tell Mr. Tanner, who you now know to be working for the Sheriff's Office, you had been working on buying some machine guns?

A No sir, I did not.

Q Did you tell Mr. Tanner that you would like to sell some machine guns for narcotics?

A No sir, I did not."

The appellant sought to impeach this evidence with the testimony of John Tanner, an undercover detective with the Harris County Sheriff's Department, Narcotics Division. Officer Tanner testified, on a bill of exception, that he had met Fontenot in his capacity as an undercover officer while trying to purchase machine guns from Fontenot. Originally, Tanner was to pay for the machine guns with marihuana, but Fontenot later demanded money. While in Fontenot's pawn shop during these negotiations, Fontenot asked Tanner if Tanner "was interested in doing a jewelry robbery on a salesman." Tanner told Fontenot he would be interested only after the machine gun negotiations were completed. Fontenot later specifically identified Charles Mize as the target of the robbery. After this robbery occurred, the negotiations on the machine guns terminated. Tanner then arranged to purchase some of the jewelry from the Mize robbery. Fontenot stated that he was the "brains of the operation" and had "set up" the Mize robbery. After Fontenot sold some jewelry to Tanner, he was arrested and subsequently indicted for that offense.

Tanner testified that during the negotiations as to the purchase of the jewelry Fontenot asked Tanner if he would be interested in killing an individual named Pope. Fontenot agreed to furnish the gun for the killing and stated he had several stolen guns in his pawn shop.

The defense argued that this evidence was admissible to impeach Fontenot's denials of these facts and to rebut the inferences his testimony left with the jury that Fontenot was "a fine Christian man." The trial court ruled that defense counsel could not introduce evidence of the "machine gun deal," the "dope deal," or of the arrangement made by Fontenot to kill Pope as they were collateral matters; but, the trial court ruled the defense could introduce the testimony concerning the Mize robbery.

The trial court's ruling was apparently based on the general principle that specific acts of misconduct by a witness are not admissible for impeachment purposes. *Hoffman v. State*, 514 S.W.2d 248 (Tex.Cr. App.); *Thrash v. State*, 482 S.W.2d 213 (Tex.Cr.App.); *Garcia v. State*, 454 S.W.2d 400 (Tex.Cr.App.). This general principle applies when reviewing the propriety of a trial court's ruling as to the admissibility of specific acts when those acts are first sought to be introduced. However, once a witness is allowed to testify concerning specific acts and events, the general principle does not apply. In such instance, the opposing party may present evidence to rebut the testimony. Such rebuttal evidence is admissible because it directly relates to the credibility of the witness and is properly admitted to dispel any false impressions conveyed to the jury by the initial testimony. *Montemayor v. State*, 543 S.W.2d 93 (Tex.Cr.App.); *Binnion v. State*, 558 S.W.2d 485 (Tex.Cr.App.); *Randolph v. State*, 499 S.W.2d 311 (Tex.Cr.App.); *Freeman v. State*, 166 Tex.Cr.R. 626, 317 S.W.2d 726; *Redding v. State*, 161 Tex.Cr.R. 53, 274 S.W.2d 712.

In *Montemayor v. State*, supra, an appeal from a conviction for aggravated assault on a police officer, we reversed a conviction for failing to allow impeachment testimony. The complaining witness, Deputy Sheriff Menchaca, testified that the appellant attacked him without provocation. On cross-examination, Menchaca denied he had ever been involved in a fight with one Oscar Antu. Later, the defendant was not allowed to present evidence from Antu that Menchaca had beaten him without provocation in the county jail. In reversing, we held:

"It is fundamental that when a witness in a criminal case testifies about a specific fact or event, and that fact or event is more than a very minor detail of his testimony, then the opposing side may present evidence to rebut the testimony. Such impeachment goes directly to the credibility of the witness, a factor that in many cases may critically affect the outcome of the prosecution. E. g., *Daley v. State*, Tex.Cr.App., 491 S.W.2d 932; *Simons v. State*, 167 Tex.Cr.R. 15, 317

S.W.2d 740; *Freeman v. State,* 166 Tex. Cr.R. 626, 317 S.W.2d 726; *Redding v. State,* 161 Tex.Cr.R. 53, 274 S.W.2d 712 (on motion for rehearing). The right to impeach the prosecution's witnesses is also one aspect of the Sixth Amendment right of confrontation. See, e. g., *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)."

In *Binnion v. State,* supra, we reaffirmed our holding in *Montemayor.* In *Binnion,* Officer Jerry Davis testified that the defendant had sold him over 14 ounces of marihuana. On cross-examination, Davis denied that he had ever smoked marihuana or that he had ever offered to sell heroin to the defendant. This Court held the trial court reversibly erred when it subsequently excluded testimony offered by the defense to rebut Davis's prior denials since such testimony went to the credibility of the witness and related to the case.

In *Randolph v. State,* supra, in an even-handed application of the rule, we affirmed a conviction for the sale of heroin. On cross-examination by the State, the defendant denied not only having sold heroin on the date charged, but denied having sold heroin to the police officers at any time. In rebuttal, the State was allowed to impeach the testimony of the defendant by showing the details of other purchases of heroin and barbiturates.

These cases rest upon the reasoning that the jury is the sole judge of the credibility of the witnesses. Having once allowed a witness to testify concerning specific acts and events which are more than trivial details of the testimony, the opposing party may then rebut that testimony in order to present the jury with the true facts from which to determine credibility. In the instant case, having allowed Fontenot to testify and deny his involvement in the transaction for the sale of machine guns and denying he sought to commission Officer Tanner to kill Pope, the appellant should have been allowed to rebut this testimony and eliminate any false impressions conveyed to the jury.

Nor can it be argued that the error was harmless. The issue of guilt was closely contested and hinged primarily upon the relative credibility of two witnesses, State's witness Fontenot and the appellant. Fontenot was an accomplice witness. His testimony was corroborated by tape recordings which he authenticated. Fontenot's testimony concerning the interpretations and impressions he drew from the taped conversations was crucial to the State's case. Further, the testimony on which the appellant sought to impeach Fontenot concerned acts occurring immediately before and after the robbery charge which formed the basis of the present offense. As was noted in *Napue v. Illinois,* supra: "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, . . . ."

Further, in *Castro v. State,* 562 S.W.2d 252 (Tex.Cr.App.), a unanimous opinion by Judge W. C. Davis, this Court held:

". . ., great latitude should be allowed a defendant in showing *any* fact which would tend to establish ill feelings, bias, motive and animus upon the part of any witness testifying against him. *Jackson v. State,* 552 S.W.2d 798 (Tex.Cr. App.1977); *Robinson v. State,* 550 S.W.2d 54 (Tex.Cr.App.1977); *Simmons v. State,* 548 S.W.2d 386 (Tex.Cr.App.1977); *Evans v. State,* 519 S.W.2d 868 (Tex.Cr.App. 1975); *Smith v. State,* 516 S.W.2d 415 (Tex.Cr.App.1974); *Blair v. State,* 511 S.W.2d 277 (Tex.Cr.App.1974).

\*　　\*　　\*　　\*　　\*　　\*

. . . By presenting evidence to the jury that, while Rhoades [a prosecution witness] had participated in some criminal offense and had been arrested for robbery and murder and indicted for theft, but that those charges were no longer pending against him, appellant sought to show that Rhoades had some interest and motive in testifying for the State. The inference that the jury *could* have drawn was that Rhoades had a personal interest in helping the prosecution prove its case against appellant and,

therefore, may have been an unreliable witness. While the jury may have chosen to reject such an inference, especially since Rhoades denied that he was testifying for the State because of his vulnerable status, this evidence was nevertheless admissible and appellant should have been permitted to prove these facts. [citations omitted]"

The appellant contends that the proffered evidence tended to show that accomplice Fontenot's testimony was prompted by his desire that no charges be filed concerning the "machine gun deal" or his solicitation of Tanner to kill Pope. V.T.C.A., Penal Code, Sections 15.03, 19.03(a)(3), 46.06(a)(2), and Section 15.01. See *Simmons v. State,* supra; *Coleman v. State,* 545 S.W.2d 831 (Tex.Cr.App.), and cases cited therein; see generally, 62 A.L.R.2d 610, 20 A.L.R.2d 1421.

As stated by the United States Supreme Court in *Davis v. Alaska,* supra:

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i. e., discredit, the witness. . . . A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence, § 940, p. 775

(Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)." [3]

While this language from *Davis* concerns primarily the right to confront witnesses by cross-examination, the principles are equally applicable under the facts of this case. The appellant sought to show, through the testimony of Officer Tanner, that Fontenot's motivation in testifying for the State was to curry favor with the prosecuting authorities in the hope that no charges would be filed on the other criminal acts. *Castro v. State,* supra; *Simmons v. State,* supra.

We cannot speculate as to whether the jury, as sole judge of the credibility of the witnesses, would have chosen to believe Tanner's testimony. The jurors were entitled to have this testimony before them in order to place Fontenot's testimony in the proper perspective and to allow the jury to make an informed judgment as to Fontenot's reliability. Consequently, the trial court reversibly erred in excluding the proffered impeachment testimony.

For the reasons set forth, I respectfully dissent.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

DALLY, Judge.

We have granted the appellant's motion for leave to file his motion for rehearing to reconsider his first ground of error which reads:

"THE LEARNED TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO ALLOW THE WITNESS, JOHN TANNER, AN UNDER-

---

3. As stated in Wharton's Criminal Evidence, Sec. 435 (13th Ed.):

"The cross-examiner is allowed great latitude in questioning a witness to ascertain his motive for testifying. This is particularly true where the defendant is cross-examining a witness for the prosecution who is a codefendant or accomplice, or who is a person threatened with criminal prosecution for an independent crime, whose testimony against the defendant may be motivated by a promise or hope of immunity or leniency."

COVER DEPUTY SHERIFF WITH THE HARRIS COUNTY, TEXAS SHERIFF'S OFFICE, TO TESTIFY AS A REBUTTAL WITNESS TO REBUT CERTAIN TESTIMONY GIVEN BY THE STATE'S WITNESS, NUKIE FONTENOT, DURING THE STATE'S CASE IN CHIEF, FOR THE REASONS HEREINAFTER SET FORTH IN THIS BRIEF."

After reconsidering this ground of error we are confident that it was properly decided and that the applicable law was clearly stated in the majority opinion on original submission. However, the appellant cites many recent cases which he argues are in conflict with our holding in this case and of which he has not obtained the "benefit;" we agree that two of the cases he cites are in conflict with our holding in this case. We will therefore discuss these cases and restate the law that we believe is applicable.

The appellant's statement of the ground of error omits an important fact, one which was also not recognized in the dissenting opinion on original submission. The testimony of Fontenot, which appellant wanted to "rebut," was not elicited by the State, but was elicited by the appellant on *cross-examination* of Fontenot. The appellant is complaining that he was not permitted by extrinsic evidence—that is by the testimony of Tanner—to contradict the testimony that he elicited from Fontenot.

The appellant is complaining that the testimony of Tanner was not admitted before the jury; appellant's ground of error is not concerned with his constitutional right of confrontation and cross-examination of the State's witness Fontenot. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and *Evans v. State,* 519 S.W.2d 868 (Tex.Cr.App.1975) are therefore not applicable and not helpful in deciding the issue presented by the appellant in this ground of error.

The applicable rule is stated by Professor McCormick as follows:

"[T]he courts maintain the safeguarding rule that a witness may not be impeached by producing extrinsic evidence of 'collateral' facts to 'contradict' the first witness's assertions about those facts. If the collateral fact sought to be contradicted is elicited on cross-examination, this safeguarding rule is often expressed by saying that the answer is conclusive or that the cross-examiner must 'take the answer.' . . .

"What is to be regarded herein as within this protean word of art, 'collateral'? The inquiry is best answered by determining what facts are not within the term, and thus finding the escapes from the prohibition against contradicting upon collateral facts. The classical approach is that facts which would have been independently provable regardless of the contradiction are not 'collateral.'

"Two general kinds of facts meet the test. The first kind are facts that are relevant to the substantive issues in the case . . . . .

"The second kind of facts meeting the above mentioned test for facts that are not collateral includes facts which would be independently provable by extrinsic evidence, apart from the contradiction, to impeach or disqualify the witness. Among these are facts showing bias, interest, conviction of crime, and want of capacity or opportunity for knowledge. *Facts showing misconduct of the witness (for which no conviction has been had) are not within the second kind of facts, but are collateral, and if denied on cross-examination cannot be proved to contradict.*

"Finally, a third kind of fact must be considered . . . . [T]he contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true [is permissible]." [Emphasis added.] McCormick, Evidence, Sec. 47 (2d ed., 1972).

A review of the authorities demonstrates that this Court has long followed the rule as stated by McCormick.

The following statement of the rule appears in *Sims v. State,* 4 Tex.App. 144, 145 (1878):

"The rule in such cases is that, upon cross-examination to try the credit of a witness, only general questions can be put, and he cannot be asked as to any collateral and independent fact merely with a view to contradict him afterwards by calling another witness. The danger of such practice is obvious, besides the inconvenience of trying as many collateral issues as one of the parties might choose to introduce, and which the other could not be prepared to meet."

In *Drake v. State*, 29 Tex.App. 265, 15 S.W. 725 (1890), the prosecuting attorney, during his cross-examination of a defense witness, elicited testimony with regard to a collateral matter. He was then permitted, over the defendant's objection, to impeach this collateral testimony through other witnesses. The Court held that such impeachment was impermissible, and reversed the judgment. In the course of its opinion, the Court reviewed the authorities as follows:

" 'When a witness is cross-examined on a matter collateral to the issue his answer cannot be subsequently contradicted by the party putting the question.' Nor is it proper to allow a witness to be cross-examined as to any matter which is collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence. Whart.Crim.Ev. (9th Ed.) Sec. 484; *Rainey v. State*, 20 Tex.App. 473; *Hart v. State*, 15 Tex.App. 202; *Johnson v. State*, 22 Tex.App. 206, 2 S.W.Rep. 609; *Brite v. State*, 10 Tex.App. 368; *Stevens v. State*, 7 Tex.App. 39. What is collateral and irrelevant matter within the rules above stated? In his work on Criminal Evidence (9th Ed. Sec. 484), Mr. Wharton, quoting from the opinion in *Hildeburn v. Curran*, 65 Pa.St. [59,] 63, says: 'The test of whether a fact inquired of in cross-examination is collateral is this: Would the cross-examining party be entitled to prove it as a part of his case tending to establish his plea?' This test has been quoted and adopted by this court in *Hart v. State*, 15 Tex.App. 202, and in *Johnson v. State*, 22 Tex.App. 206, 2 S.W.Rep. 609." 15 S.W. at 727.

More recently, the correct rule was stated and applied in *Arechiga v. State*, 462 S.W.2d 1, 2 (Tex.Cr.App.1971):

"In *Gatson v. State*, Tex.Cr.App., 387 S.W.2d 65, this Court held that when a witness is cross-examined on a collateral matter even to impeach his testimony, the cross-examining party cannot then contradict the witness. The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as a part of his case tending to establish his plea. *Britton v. State*, 130 Tex.Cr.R. 241, 93 S.W.2d 744; 1 Branch's Annotated Penal Code 221, Sec. 200. See: *Corpus v. State*, 463 S.W.2d 4 (1970).

"If appellant as a part of his direct evidence, had tried to prove that Serna was in the state hospital on a particular date it would have been inadmissible. The Court, in excluding the inadmissible evidence, in no way violated the due process clause of the Fourteenth Amendment to the United States Constitution as alleged by appellant."

The two principal cases on which appellant relies are *Montemayor v. State*, 543 S.W.2d 93 (Tex.Cr.App.1976), and *Binnion v. State*, 558 S.W.2d 485 (Tex.Cr.App.1977), which were also relied upon in the dissenting opinion on original submission. In *Montemayor*, the prosecution was for aggravated assault on a peace officer. The defendant contended he acted in self-defense. During his cross-examination by defense counsel, Officer Menchaca, the complaining witness, admitted knowing one Oscar Antu but denied ever having a fight with him. The defense later called Antu as a witness, but the trial court refused to permit Antu to testify to an alleged beating he had received at the hands of Officer Menchaca. We held that the proffered testimony was proper impeachment and was erroneously excluded.

In *Binnion*, the prosecution was for delivery of marihuana. The State's chief witness was an undercover agent who denied, during cross-examination by defense counsel, ever smoking marihuana or offering to

sell heroin to the defendant. The defendant subsequently offered the testimony of two other witnesses who would have contradicted this testimony by the agent. Citing *Montemayor*, we held that the proffered impeachment testimony was erroneously excluded by the trial court.

■ We have concluded that *Montemayor* and *Binnion* were not correctly decided. In both cases, the facts adduced during cross-examination were collateral; that is, they would not have been independently provable regardless of the contradiction: the facts were not relevant to the substantive issues in the case; the facts were not independently provable by extrinsic evidence, apart from the contradiction, to impeach or disqualify the witness; the facts were not part of the background of a material transaction about which the witness would not have been mistaken if his story were true. To the contrary, the facts concerned alleged acts of misconduct by the witness for which no conviction had been had. The holding in *Montemayor* and *Binnion*, that the defendant should have been permitted to elicit testimony on a collateral matter during cross-examination of a State witness and subsequently impeach that testimony through a different witness, is contrary to the well-established rule in this and other jurisdictions. *Montemayor* and *Binnion* are overruled to the extent they conflict with this opinion and the majority opinion on original submission.

In *Cooper v. State*, 578 S.W.2d 401 (Tex. Cr.App.1979), not cited by appellant, the trial court refused to permit a defense witness to testify on the grounds that the witness had entered the courtroom after the Witness Rule had been invoked and his proffered testimony constituted impeachment of a State witness on collateral matters first brought out during cross-examination. The majority opinion in *Cooper*, while upholding the action of the trial court on the first ground, stated that the trial court had been in error concerning the second ground. The majority cited *Binnion* and *Montemayor* with approval. To this extent, the majority opinion in *Cooper* is in error and is overruled.

In the instant case, Fontenot denied, during cross-examination by defense counsel, negotiating an unlawful gun sale to Tanner and asking Tanner to kill a man. These matters were wholly collateral, involving alleged acts of misconduct by Fontenot for which no conviction had been had. The trial court did not err in refusing to permit the impeachment of Fontenot on these collateral matters.

■ The other cases cited by appellant involve situations in which this Court concluded that the trial court had improperly excluded evidence offered by the defendant tending to show a witness' bias, prejudice, interest, or motive to testify against him. *Blair v. State*, 511 S.W.2d 277 (Tex. Cr.App.1974); *Jackson v. State*, 482 S.W.2d 864 (Tex.Cr.App.1972); *Simmons v. State*, 548 S.W.2d 386 (Tex.Cr.App.1977); *Randle v. State*, 565 S.W.2d 927 (Tex.Cr.App.1978). Of course, the accused should be allowed great latitude to show the bias or prejudice of a witness against him. Indeed, evidence of pending criminal charges against a witness is admissible under certain circumstances for the limited purpose of showing bias or motive as an exception to the statutory rule that unadjudicated criminal offenses may not be used for impeachment. Art. 38.29, V.A.C.C.P.; *Randle v. State*, supra; *Castro v. State*, 562 S.W.2d 252 (Tex. Cr.App.1978). But no charges had been brought against Fontenot for either of the alleged activities to which Tanner would have testified. It should also be noted that appellant did not call Tanner to testify before the jury concerning Fontenot's involvement in the Mize robbery although the trial court ruled that such testimony was admissible. See *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979). Finally, the record does not show that Tanner had any personal knowledge as to whether or not the State had offered Fontenot any consideration for his testimony. We adhere to our opinion on original submission that the trial court did not abuse its discretion in concluding that the testimony in question was not admissible to show Fontenot's bias or motive to testify against appellant.

The appellant's motion for rehearing is overruled.

ROBERTS, J., concurs in result.

PHILLIPS, J., dissents.

ODOM and CLINTON, JJ., not participating.